**E-Filed: 03.30.10**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

REUBEN K. LUJAN,

        Petitioner,

    vs.

SYLVIA GARCIA, Warden

        Respondent.

CASE NO. CV 04-01127 MMM (RCF)

ORDER SUPPLEMENTING AND
AMENDING REPORT AND
RECOMMENDATION OF UNITED
STATES MAGISTRATE JUDGE

        Pursuant to 28 U.S.C. § 636, the court has reviewed the petition, all of the records and files herein, the Report and Recommendation of United States Magistrate Judge Rita Coyne Federman, and the objections filed by respondent. Based on its *de novo* determination of the issues presented, the court concurs with and adopts the findings and conclusions set forth in Judge Federman's Report and Recommendation as supplemented and amended by this order:

        Respondent asserted three objections to Judge Federman's Report and Recommendation. The court considers each in turn.

**A.**     **Whether the Supreme Court's Decision in *Harrison v. United States* Constitutes Clearly Established Federal Law**

Judge Federman found that, in concluding that the admission of petitioner's confession obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), was harmless error, the California Court of Appeal failed to consider the United States Supreme Court's opinion in *Harrison v. United States*, 392 U.S. 219 (1968), and thus reached a decision that was contrary to clearly established law.  Respondent objects to this finding on the basis that *Harrison* is not a decision of constitutional law, but rather is dependent on certain federal rules or statutes that are not applicable in this case.  Contrary to respondent's contention, Judge Federman concluded that *Harrison* had constitutional underpinnings.  To resolve this question, a review of the complex factual and procedural background of *Harrison* is warranted.

Eddie Harrison was arrested on March 19, 1960 for a theft that occurred on March 18, 1960, Harrison's eighteenth birthday.  *Harrison v. United States* ("*Harrison I*"), 359 F.2d 214, 219 (D.C. Cir. 1965).  On March 21, 1960, police officers questioned Harrison regarding a robbery and murder that occurred on March 8, 1960, while Harrison was still a minor.  The interrogation took place while Harrison was in jail awaiting grand jury proceedings on the theft charge.  *Id.* at 219-20.  The officers brought with them to the jail two alleged co-conspirators in the murder, each of whom had previously confessed, and each of whom recounted for Harrison his confession implicating Harrison as the shooter.[1]  The officers asked Harrison if he wished to make a statement regarding the role each of the three co-conspirators had played in the robbery and homicide; Harrison said yes.  Harrison made an oral statement regarding the co-conspirators' plan to rob the victim, and confessed to holding the shotgun; he said, however, that the victim had slammed a glass door shut, that the glass hit the shotgun, and that the shotgun unintentionally

---

[1]The confessions of Harrison's co-conspirators were deemed inadmissible because their detention had been unlawful.

discharged.  *Id.* at 220.[2]  Several hours after Harrison's statement, officers returned to the jail with Harrison's co-conspirators and reduced Harrison's statement to writing.  *Id.* at 222.

A panel of the D.C. Circuit Court of Appeals reviewed the admission by the district court of Harrison's confessions and issued a split decision.[3]  Judge Donaher, writing for the panel, held that Harrison had not shown that his oral confession was involuntary, and concluded there was no due process violation as a result.  Judge Donaher declined to apply *Harling v. United States*, 295 F.2d 161 (1961) (en banc), in which the D.C. Circuit held that admissions by a minor in juvenile proceedings must be excluded in later adult criminal proceedings.  *Id.* at 163-64.  Judge Donaher noted that, regardless of Harrison's age, he was not incarcerated in connection with a juvenile proceeding.  *Harrison I*, 259 F.2d at 221.  He held, however, that Harrison's written confession should have been excluded under the rule of *Mallory v. United States*, 354 U.S. 449 (1957), which required the exclusion of confessions elicited during prolonged interrogation in violation of the prompt arraignment requirement of Rule 5(a) of the Federal Rules of Criminal Procedure. *Id.* at 222.  Judge Donaher also held than an unspecified but incriminating statement Harrison made to a jail classification officer was inadmissible under *Killough v. United States*, 336 F.2d 929 (D.C. Cir. 1964).  The *Killough* court had held that a confession made to a jail classification officer was not admissible because the questioning was intended to serve limited classification purposes and the prisoner was told that any statements he made would not be used against him.  *Killough*, 336 F.2d at 931-32.  Judge Miller wrote separately and joined Judge Donaher's opinion to the extent it addressed *Harling*.  He was otherwise silent regarding Harrison's confessions.  *Harrison I*, 359 F.2d at 222 (Miller, J., concurring).  Judge Washington concurred, but opined that all of Harrison's confessions were excludable under *Harling*.  *Id.*

---

[2]Harrison's lack of intent was not material, and the government did not contest it at trial, because the shooting occurred during the perpetration of a felony.  *Id.* at 220 n. 17.

[3]Harrison's conviction occurred prior to the District of Columbia Court Reform and Criminal Procedure Act of 1970, which vested jurisdiction over criminal matters in a local court system.  Consequently, Harrison was tried in the federal District Court for the District of Columbia for violation of Washington, D.C.'s criminal code.  Harrison took a direct appeal of the conviction to the D.C. Circuit.

(Washington, J., concurring).

Following the panel decision, the D.C. Circuit Court of Appeals ordered rehearing en banc on the issue of the admissibility of Harrison's oral confession. The en banc court extended *Harling* to require exclusion of any confession made by a prisoner while within the exclusive jurisdiction of the Juvenile Court. It found that Harrison had been within the exclusive jurisdiction of the Juvenile Court from the moment he committed his crime until the Juvenile Court waived jurisdiction. *Harrison I*, 359 F.2d at 223-29 (en banc).

As a result, the D.C. Circuit remanded Harrison's case for a third trial.[4] Because it could no longer rely on Harrison's out-of-court confessions, the government introduced portions of Harrison's testimony from the second trial during its case in chief. *Harrison v. United States* ("*Harrison II*"), 387 F.2d 203, 208 (D.C. Cir. 1967). The D.C. Circuit held that reading Harrison's prior testimony into the record did not violate his rights. In particular, it concluded that the "fruit of the poisonous tree" doctrine was not applicable because the relationship between the erroneous admission of the jailhouse confessions and Harrison's subsequent trial testimony was so attenuated as to dissipate any taint. *Id.* at 209-10.

The Supreme Court reversed, noting that "petitioner testified only after the Government had illegally introduced into evidence three confessions, all wrongfully obtained. . . ." It held that "the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby – the fruit of the poisonous tree, to invoke a time-worn metaphor." *Harrison v. United States*, 392 U.S. 219, 222 (1968) (footnote omitted). The Supreme Court relied on the general rule concerning the fruit of the poisonous tree doctrine articulated in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920). It stated that the "'essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.'"

---

[4]Harrison's first conviction had been vacated by the district court because he was represented by an imposter attorney, one Daniel Jackson Oliver Wendel Holmes Morgan. *Id.* at 216.

*Harrison*, 392 U.S. at 222 (quoting *Silverthorne*, 251 U.S. at 392).[5]  The Court held that because Harrison had testified "in order to overcome the impact of confessions illegally obtained and hence improperly introduced, . . . his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible."  *Id.* at 223.

The exclusionary rule mandates that evidence derived from constitutional violations not be used at trial because illegally derived evidence is considered "fruit of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).   The exclusionary rule serves to deter constitutional violations by denying the government the benefit of those violations; as a result, "the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served."  *Segura v. United States*, 468 U.S. 796, 804 (1984).  As the Supreme Court in *Wong Sun* explained, it is important to determine whether the evidence in question derived directly from exploitation of the constitutional violation or whether it was obtained "by means sufficiently distinguishable to be purged of the primary taint."  *Wong Sun*, 371 U.S. at 488.

Both *Wong Sun* and *Silverthorne* concerned an underlying Fourth Amendment violation.  In *Michigan v. Tucker*, 417 U.S. 433 (1974), the Supreme Court considered the scope of the exclusionary rule in light of *Miranda* and *Wong Sun*.  It noted that the "Court [had] said in *Miranda* that statements taken in violation of the *Miranda* principles must not be used to prove the prosecution's case at trial," *id.* at 445, and considered how that rule applied to a situation in which the defendant's constitutional privilege against self-incrimination had not been infringed, but police had "departed . . . from the proplylactic standards later laid down by this Court in

---

[5]*Silverthorne* was a Fourth Amendment case in which the Court held that the government cannot avail itself of knowledge gained through a wrongful search and seizure.  The *Silverthorne* Court noted the government's position "that although . . . its seizure was an outrage which [it] now regrets, it may study the papers before it returns them, copy them, and then . . . use the knowledge that it has gained to call upon the owners in a more regular form to produce them; [the government contends] that the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act. . . . [This argument] reduces the Fourth Amendment to a form of words."  *Silverthorne*, 251 U.S. at 391-92.

*Miranda* to safeguard that privilege." *Id.* at 446.  Specifically, the police had used Tucker's non-Mirandized confession to find another witness, whose testimony Tucker then sought to suppress. *Id.* at 437-38.  The Court declined to exclude the witness' testimony, noting that Tucker's non-Mirandized confession had been excluded, and that excluding the testimony of the third party witness would not "significantly augment[ ]" the deterrent effect of *Miranda* on police conduct. *Id.* at 447-48.  Because the confession had been voluntary and thus had not been obtained in violation of the Fifth Amendment, the Court concluded that utilizing the fruits of the confession did not violate *Wong Sun*.

Some years later, the Court addressed the distinction between application of the exclusionary rule in the Fourth and Fifth Amendment contexts in *Oregon v. Elstad*, 470 U.S. 298 (1985).  There it stated:

> "[A] procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine.  The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits. . . .  Where a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. . . .  Beyond this, the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.

> "The *Miranda* exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself.  It may be triggered even in the absence of a Fifth Amendment violation.  The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony.  Failure to administer *Miranda* warnings creates a presumption of compulsion.  Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*.  Thus, in the individual case, *Miranda*'s preventive medicine provides a remedy even to

1   the defendant who has suffered no identifiable constitutional harm." *Id.* at 307-08

2   (footnotes omitted) (emphasis original).

3   Because a statement can be voluntary, as required by the Fifth Amendment, even if obtained in

4   violation of *Miranda*, the Court held that the reasoning of *Tucker* "applie[d] with equal force when

5   the alleged 'fruit' of a noncoercive *Miranda* violation [was] neither a witness nor an article of

6   evidence but the accused's own voluntary testimony." *Id.* at 308.  See also *id.* ("Since there was

7   no actual infringement of the suspect's constitutional rights [in *Tucker*], the case was not

8   controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be

9   suppressed.  In deciding 'how sweeping the judicially imposed consequences' of a failure to

10  administer *Miranda* warnings should be, the *Tucker* Court noted that neither the general goal of

11  deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence

12  would be served by suppression of the witness' testimony").  The Court therefore concluded that

13  a subsequent *Miranda* "warning [given after the making of an unwarned statement] conveys the

14  relevant information and thereafter the suspect's choice whether to exercise his privilege to remain

15  silent should ordinarily be viewed as an 'act of free will.'" *Id.* at 311 (quoting *Wong Sun*, 371

16  U.S. at 486).[6]

17      In reaching this result, the Court considered Elstad's argument that "he was unable to give

18  a fully *informed* waiver of his rights because he was unaware that his prior statement could not

19  be used against him." *Id.* at 316 (emphasis original).   The Court noted that it had never

20  "embraced the theory that a defendant's ignorance of the full consequences of his decisions

21  vitiates their voluntariness." *Id.*   It noted, however, that "[i]f the prosecution has actually

22  violated the defendant's Fifth Amendment rights by introducing an inadmissible confession at

23

24      [6]The Court subsequently limited the *Elstad* holding in *Missouri v. Seibert*, 542 U.S. 600

25  (2004).  The *Seibert* Court held that *Miranda* warnings, deliberately given mid-interrogation, after
    the defendant had made an unwarned confession, were ineffective, and thus a confession repeated

26  after warnings were given was inadmissible at trial.  See *id*. at 622 (Kennedy, J., concurring)
    (concluding that the fact that police engage in a "two-step questioning technique based on a

27  deliberate violation of *Miranda*" should be deemed an exception to the *Elstad* rule).  *Seibert* is not

28  applicable in this case.

trial, compelling the defendant to testify in rebuttal, the rule announced in *Harrison*[ ] precludes use of that testimony on retrial. 'Having "released the spring" by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony.'" *Id.* at 316-17 (quoting *Harrison*, 392 U.S. at 224-25).[7]

It is clear from a review of *Harrison* and subsequent Supreme Court cases that *Harrison* announced a rule of clearly established federal law. The scope of this rule has been described by the Ninth Circuit as follows:

> "A defendant's testimony in a prior trial is normally admissible in subsequent proceedings. *Harrison* states that an exception to this rule arises when the defendant's prior testimony was compelled by the need to counter evidence that was illegally obtained and improperly admitted." *United States v. Mortensen*, 860 F.2d 948, 951 (9th Cir. 1988).[8]

See also *Luna v. Massachusetts*, 354 F.3d 108, 112 (1st Cir. 2004) ("The premise of *Harrison* was that the original confession (actually several confessions . . .) had been wrongfully obtained under federal law").

The Third Circuit has held that *Harrison* "mandate[s] what is essentially an exclusionary rule inquiry where there appears to be a link between a constitutional violation and a defendant's subsequent decision to take the stand." *United States v. Pelullo*, 173 F.3d 131, 136 (3d Cir. 1999). Thus, "when the prosecution introduces an inadmissible confession at trial and thereby compels the defendant to testify in rebuttal, use of the defendant's testimony at a later proceeding

---

[7]The Supreme Court later clarified *Elstad*, emphasizing that the "decision in that case – refusing to apply the traditional 'fruits' doctrine developed in Fourth Amendment cases – does not prove that *Miranda* is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." *Dickerson v. United States*, 530 U.S. 428, 441 (2000).

[8]Circuit "precedent derived from an extension of a Supreme Court decision is not 'clearly established federal law as determined by the Supreme Court.'" *Earp v. Ornoski*, 431 F.3d 1158, 1182 (9th Cir. 2005) (quoting *Duhaime v. Ducharme*, 200 F.3d 597, 602-03 (9th Cir. 2000)). "Circuit precedent is relevant only to the extent it clarifies what constitutes clearly established law." *Id.*

is barred." *United States v. Baker*, 850 F.2d 1365, 1370 (9th Cir. 1988).

The fact that the underlying confession in *Harrison* was illegally obtained not because it violated constitutional protections, but because it violated non-constitutional rules is beside the point. *Harrison* sweeps more broadly than respondent acknowledges: If a defendant testifies "in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony [is] tainted by the same illegality that rendered the confessions themselves inadmissible." *Harrison*, 392 U.S. at 222. The court need not determine whether the exclusionary rule announced in *Harrison* is constitutionally based. Respondent does not dispute the fact that *Harrison* articulates a rule of *federal law*; that rule "prohibits the use of any testimony impelled [by an illegal confession as] the fruit of the poisonous tree. . . ." *Harrison*, 392 U.S. at 222 ("[T]he 'essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all,'" quoting *Silverthorne*, 251 U.S. at 392). It would be anomalous if this exclusionary rule were to apply confessions obtained in violation of federal rules or statutes, but not to confessions obtained in violation of the federal Constitution or prophylactic rules adopted by the Supreme Court to safeguard constitutional rights .

Respondent's argument that § 2254(d)(1) applies only to clearly established *constitutional* law is misplaced. The plain text of the statute reveals the fallacy in the contention; it states that state court decisions must not be contrary to "clearly established Federal law." It does not limit the "contrary to" rule to constitutional principles only. Cf. *Medellin v. Dretke*, 544 U.S. 660, 680 (2005) (noting that "a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country" and consequently that a non-constitutional rule embodied in a treaty may constitute clearly established federal law under AEDPA); *Rankins v. Murphy*, 198 F.Supp.2d 3, 6 (D. Mass. 2002) (finding that statutory claims, such as a violation by the state court of the federal wiretap statute, may be cognizable under § 2254).

Respondent's reliance on *Early v. Packer*, 537 U.S. 3 (2002), is also misplaced. In *Early*,

the Supreme Court overturned the Ninth Circuit's conclusion that clearly established federal law prohibited a state court from giving certain instructions to a jury that urged it to engage in further deliberations in order to reach a verdict. Although the Supreme Court had prohibited the giving of such instructions in federal court trials, a subsequent Supreme Court decision stated in dicta that the earlier opinions had been based on the Court's supervisory power over federal courts rather than any provision of the Constitution. *Id.* at 9-10 (citing *Lowenfield v. Phelps*, 484 U.S. 231, 239 n. 2 (1988)). *Early* is plainly distinguishable. *Harrison* did not rely on the Court's supervisory powers over federal courts in evaluating the scope of the exclusionary rule; rather, it relied on federal constitutional cases such as *Silverthorne* and *Wong Sun*. There is, moreover, no intervening dicta (as there was in *Early*) stating that *Harrison* is not based on federal law. To the contrary, the statement in *Elstad*, whether or not dicta,[9] establishes

_____

[9]Respondent asserts that *Elstad*'s discussion of *Harrison* is dicta. Whether respondent is correct is a difficult question. On the one hand, the prosecution in *Elstad* did not "actually violate[ ] the defendant's Fifth Amendment rights by introducing an inadmissible confession at trial." *Elstad*, 470 U.S. at 316-17. Thus, the Court's discussion of what *Harrison* required in the event of a violation of defendant's Fifth Amendment rights was not strictly required. On the other hand, the *Elstad* Court, having articulated an exception to the exclusionary rule, felt compelled to indicate that the exception did not extend to the situation presented in *Harrison*. The comprehensive rule the Court enunciated for determining when a waiver is, and is not, fully informed, encompassed the factual circumstances involved in *Harrison*. See *id.* at 316-17 ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness. If the prosecution has actually violated the defendant's Fifth Amendment rights by introducing an inadmissible confession at trial, compelling the defendant to testify in rebuttal, . . . *Harrison* . . . precludes use of that testimony on retrial. . . . But the Court has refused to find that a defendant who confesses, after being falsely told that his codefendant has turned State's evidence, does so involuntarily. The Court has also rejected the argument that a defendant's ignorance that a prior coerced confession could not be admitted in evidence compromised the voluntariness of his guilty plea. Likewise, . . . the Court declined to accept defendant's contention that, because he was unaware of the potential adverse consequences of statements he made to the police, his participation in the interview was involuntary. Thus we have not held that the sine qua non for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all of the consequences flowing from the nature and the quality of the evidence in the case" (citations omitted)).

As Judge Pierre Leval has explained:
"I do not mean to imply that in all cases it is easy, or even possible, to reach a confident conclusion whether a statement should be considered dictum or holding.

that *Harrison*'s holding is a matter of clearly established federal law.

Consequently, having reviewed *de novo* the findings of Judge Federman, the court finds, for the reasons stated herein, that the California Court of Appeal's decision was contrary to clearly established Supreme Court precedent, and that petitioner's trial testimony was induced by the government's introduction of his confession.[10]   For this reason, respondent's first objection is overruled.

---

At times a proposition advanced by the court will support the court's decision to grant judgment to the plaintiff or defendant, but indirectly or remotely.  There is no line demarcating a clear boundary between holding and dictum.  What separates holding from dictum is better seen as a zone, within which no confident determination can be made whether the proposition should be considered holding or dictum."  Judge Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. REV. 1249, 1258 (2006).

In this case, it is not necessary for the court to determine whether *Elstad*'s discussion of *Harrison* is dictum or holding.  Plainly, if part of the holding, respondent's objection fails. Because the court finds that *Harrison* is clearly established federal law, however, the reference in *Elstad*, even if dictum, does not affect the result.

The court notes that, unlike the present case, the statement in *Lowenfield* that prior cases addressing jury instructions did not govern proceedings in state courts was plainly dicta.  In two sentences in a footnote, the Court "note[d]" that *Jenkins v. United States*, 380 U.S. 445 (1965), was not a constitutional law case, but rather a case concerning the Supreme Court's supervisory powers.  *Id.* at 239 n. 2.   The Court then proceeded to analyze whether the state court's  jury instruction was coercive, and its determination that it was not is the holding of the case.  *Id.* at 241 ("We hold that on these facts the combination of the polling of the jury and the supplemental instruction was not 'coercive' in such a way as to deny petitioner any constitutional right"); cf. Leval, 81 N.Y.U. L. REV. at 1258 ("Nonetheless, to say that the distinction between holding and dictum is sometimes murky does not mean that it is always murky.  In many instances there can be no doubt that the proposition in question played no role in the court's justification of its judgment").  Given the fact that its discussion of *Jenkins* was clearly dicta, *Lowenfield* indicates that the Supreme Court has used dicta regarding its past decisions to clarify whether or not a particular case presents a question of clearly established federal law binding on the state courts.

[10]Respondent does not challenge petitioner's assertion that he would not have testified had his prior confession not been introduced.

**B.      Respondent's Objection to Findings Regarding the Underlying *Miranda* Violation**

**1.      Whether *De Novo* Review is Appropriate**

Respondent also objects to Judge Federman's finding that respondent conceded the correctness of the California Court of Appeal's finding that petitioner's confession was obtained in violation of *Miranda*.   She asserts that this state court finding, which favors petitioner, is subject to *de novo* review on federal habeas review.   In her Report and Recommendation, Judge Federman noted that, even employing a *de novo* standard, she would find a violation.[11]

In support of this objection, respondent cites *Daniels v. Lafler*, 501 F.3d 735 (6th Cir. 2007).   There, a state trial court, frustrated by the fact that appointed counsel was not promptly preparing for trial, replaced the attorney on its own motion with a lawyer who could try the case on the trial date that had been set.   *Id.* at 738.   At the next hearing, defendant attempted to raise an objection, but was told he could speak only through his new appointed counsel.   The attorney did not object.   *Id.*

The Michigan Court of Appeals, the last state court to consider defendant's Sixth Amendment claim that he had been denied the right to counsel of choice, concluded that defendant had acquiesced in the replacement of counsel and that the trial court had good cause to replace counsel.   *Id.* at 739.   The state court also found, however, that, had this not been the case, it would have resolved the Sixth Amendment question in defendant's favor.   Specifically, it stated that, had there not been consent, it would have applied the rule that "[a]fter adversary judicial proceedings have been initiated, a trial court's removal of a criminal defendant's appointed counsel for any reason other than gross incompetence, physical incapacity, or contumacious conduct violates the defendant's constitutional right to counsel."   *Id.* at 739-40 (quoting *People v. Daniels*, No. 210014, 2000 WL 33406706, *3 (Mich. Ct. App. Oct. 3, 2000)).   Given the state court's holding regarding consent, the Sixth Circuit characterized this finding as the "state court's treatment of an issue in a manner favorable to the petitioner but not dispositive of his claim for

---

[11]Report & Recommendation at 21 n. 10.

relief." *Id.* at 740.  It stated:

> "In this situation, we think that de novo review is appropriate.  We should not
> apply AEDPA deference to the state court's pro-petitioner resolution of the issue
> because AEDPA's standard of review is 'a precondition to the grant of habeas relief
> ("a writ of habeas corpus . . . shall not be granted" unless the conditions of
> § 2254(d) are met), not an entitlement to it.'  *Fry v. Pliler*, 551 U.S. 112[, 119]
> (2007).  Nor should we apply AEDPA deference to a hypothetical ruling against
> the petitioner on the disputed constitutional question: 'AEDPA applies only to
> claims 'adjudicated on the merits in State court proceedings,' and the standard of
> review it mandates depends on an assessment of *an actual decision* made by the
> state court.'  *Eddleman v. McKee*, 471 F.3d 576, 583 n. 3 (6th Cir. 2006)
> (emphasis in original) (quoting 28 U.S.C. § 2254(d)).  As a result, we default back
> to the standard of review that we would have applied prior to the passage of
> AEDPA – i.e., to *de novo* review."  *Daniels*, 501 F.3d at 740.

*Daniels* relies on the Supreme Court's recent decision in *Fry v. Pliler*, 551 U.S. 112
(2007).  There, the Court considered the standard for assessing whether error is harmless, namely
whether it "'had substantial and injurious effect or influence in determining the jury's verdict,'"
*Brecht v. Abrahamson*, 507 U.S. 619, 631 (1994) (quoting *Kotteakos v. United States*, 328 U.S.
750, 776 (1946)), and whether that standard had survived the enactment of AEDPA.  In *Mitchell
v. Esparza*, 540 U.S. 12 (2003) (per curiam), the Court had held that, when a state court
determined that a constitutional violation was harmless, a federal court could not award habeas
relief under § 2254 unless the harmlessness determination itself was unreasonable.  The petitioner
in *Fry* argued that § 2254(d)(1) eliminated *Brecht*'s requirement that the petitioner show
substantial and injurious effect.  The Supreme Court decided that elimination of this standard was
not suggested by the text of AEDPA, which sets forth preconditions, but not standards, for the
granting of habeas relief.  This interpretation was warranted, the Supreme Court stated, by virtue
of the fact that § 2254(d) provides that "a writ of habeas corpus . . . shall *not* be granted . . .
*unless*" its requirements are satisfied.  *Fry*, 551 U.S. at 119 (emphasis supplied).  The Supreme

1    Court also found it "implausible" that AEDPA would expand the right to habeas corpus, when

2    "AEDPA [was intended to] limit[ ] rather than expand[ ] the availability of habeas relief." *Id.*

3    (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  The Sixth Circuit interpreted *Fry* to mean

4    that § 2254(d) adds further restrictions to the granting of habeas relief, but that the standards

5    governing entitlement to the writ that existed before AEDPA still apply.  *Daniels*, 501 F.3d at

6    740.  See also Brian R. Means, FEDERAL HABEAS MANUAL § 3:67 (2009) ("A state court's

7    resolution of a question of law, or a mixed question of fact and law, favorable to the petitioner

8    is not entitled to deference in the federal proceeding").

9        *Fry* and *Daniels* persuade the court that the amount of deference afforded state court

10   judgments that benefit a petitioner but are not dispositive of his habeas claim is that which was

11   afforded before the passage of AEDPA.  In *Daniels*, however, the Sixth Circuit identified no pre-

12   AEDPA case that dictated *de novo* review of such findings.  In 1992, when the last pre-AEDPA

13   decision on deference to state court judgments was decided, the Supreme Court had not yet

14   determined whether deference should be given to state court resolutions of mixed questions of

15   constitutional law and fact.  *Wright v. West*, 505 U.S. 277 (1992).  In *Wright*, Justice Thomas,

16   writing for himself and two other Justices, reviewed prior decisions regarding the level of

17   deference, if any, that should be given to a state court judgment.  *Id.* at 287-90.  Justice Thomas

18   first discussed *Jackson v. Virginia*, 443 U.S. 307 (1979), which held that a state court judgment

19   applying the rule that a conviction violates due process if supported  only by evidence from which

20   no rational trier of fact could find guilt beyond a reasonable doubt "is of course entitled to

21   deference" on federal habeas.  Justice Thomas rejected the notion that *Jackson* established a

22   deferential standard, because elsewhere in *Jackson*, the Court had opined that the habeas court

23   itself should apply the *Jackson* standard rather than merely review the state court's application of

24   it for reasonableness.  *Wright*, 505 U.S. at 290 (citing *Jackson* 443 U.S. at 323-24).  Indeed,

25   Justice Thomas characterized earlier decisions as evidencing "apparent adherence to a standard

26   of *de novo* habeas review with respect to mixed constitutional questions."  Nonetheless, he

27   concluded that the Court had "implicitly questioned that standard, at least with respect to pure

28   legal questions. . . ."  *Id.* at 291.  Justice Thomas also declined a request by the petitioner-warden

to reconsider, in light of *Teague v. Lane*, 489 U.S. 288 (1989), the statement in *Miller v. Fenton*, 474 U.S. 104, 112 (1985), that mixed questions of constitutional law and fact are "subject to plenary review" on habeas review.  Despite a lengthy exegesis, Justice Thomas left the question undecided, concluding that the habeas petitioner's claim failed regardless of the standard applied.  It thus appears that the statement in *Miller* stands.

Justice O'Connor wrote for herself and two other Justices, concurring in the judgment but writing separately to emphasize her view that prior Supreme Court case law had "rejected a deferential standard of review of issues of law."  *Wright*, 505 U.S. at 300 (O'Connor, J., concurring).  Justice O'Connor asserted that prior case law clearly held that "'mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.'"  *Id.* (quoting *Irvin v. Down* 366 U.S. 717, 723 (1961), in turn quoting *Brown v. Allen*, 344 U.S. 443, 507 (1953) (Frankfurter, J., concurring)).[12]  See also *id.* at 305 ("[A] state court's incorrect legal determination has [never] been allowed to stand because it was reasonable.  We have always held that federal courts, even on habeas, have an independent obligation to say what the law is").

Justice Kennedy also wrote separately to emphasize that he "would not interpret *Teague* as calling into question the settled principle that mixed questions are subject to plenary review on federal habeas corpus."  *Wright*, 505 U.S. at 309 (Kennedy, J., concurring).  Because Justices White and Souter wrote separate opinions that did not address the standard of review debate, four Justices were of the opinion *de novo* review was appropriate for all mixed questions of constitutional law and fact, while three explicitly declined to resolve this issue.  The remaining two Justices did not discuss the question.

---

[12]Justice O'Connor later revisited this issue in a post-AEDPA decision.  She stated: "Under the federal habeas statute as it stood in 1992, . . . our precedents dictated that a federal court should grant a state prisoner's petition for habeas relief if that court were to conclude in its independent judgment that the relevant state court had erred on a question of constitutional law or on a mixed constitutional question."  *Williams*, 529 U.S. at 400-01 (O'Connor, J., concurring).  Part II of Justice O'Connor's opinion was the opinion of the Court in *Williams*; the balance of the opinion, including the quoted material, was a concurrence.

1    Since, in *Wright*, four Justices opined that it was appropriate to review mixed questions
2    of constitutional law and fact *de novo*, and since three Justices joined Justice Thomas's opinion,
3    which at a minimum demonstrated that prior Supreme Court precedent strongly indicated  that a
4    *de novo* standard applied, the court finds respondent's argument regarding the proper standard of
5    review persuasive.  The court will therefore apply a *de novo* standard in reviewing whether the
6    California Court of Appeal properly concluded that petitioner's rights under *Miranda* were
7    violated.

8              **2.       Whether Judge Federman's Finding Is Supported Under *De Novo***
9              **Review**

10   In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, because of the
11   inherently coercive nature of custodial interrogation, a person must be advised of his or her
12   constitutional rights – including the right to an attorney and the right to remain silent – prior to
13   questioning.  *Id.* at 444 ("[T]he prosecution may not use statements, whether exculpatory or
14   inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use
15   of procedural safeguards effective to secure the privilege against self-incrimination"); see *United*
16   *States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001).  The government can introduce an
17   incriminating statement made by a defendant during custodial interrogation only if it shows that
18   the defendant voluntarily, knowingly, and intelligently waived his or her *Miranda* rights.
19   *Miranda*, 384 U.S. at 475 ("If the interrogation continues without the presence of an attorney and
20   a statement is taken, a heavy burden rests on the government to demonstrate that the defendant
21   knowingly and intelligently waived his privilege against self-incrimination and his right to retained
22   or appointed counsel").  The burden rests with the government because it is responsible for "the
23   . . . circumstances under which the interrogation takes place and has the only means of making
24   available corroborated evidence of warnings given during incommunicado interrogation. . . ."
25   *Id.*

26   In *Miranda*, the Supreme Court established certain "procedural safeguards" that must be
27   employed to protect the privilege against self-incrimination.  These require that an accused "be
28   warned prior to any questioning that he has the right to remain silent, that anything he says can

be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." In connection with advisement of the right to counsel, the accused "must be clearly informed [both] that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." *Id.* at 471.

The Supreme Court cautioned that circumstantial evidence that a particular defendant might have been aware of these rights would not satisfy the requirement that he be specifically warned. *Id.* at 471-72 ("As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right").

More recently, in *Dickerson v. United States*, 530 U.S. 428 (2000), the Supreme Court emphasized the importance of *Miranda* warnings. After *Miranda* was decided, Congress passed a law "intended . . . to overrule *Miranda*," which designated voluntariness as the touchstone for admissibility of a confession and directed trial courts to apply a nonexclusive list of relevant factors in assessing voluntariness. *Id.* at 436-37. The Court, however, concluded that *Miranda* announced a constitutional rule that Congress could not supersede legislatively. *Id.* at 443-44. It stated: "In *Miranda*, the Court noted that reliance on the traditional totality-of-the-circumstances test raised a risk of overlooking an involuntary custodial confession, . . . a risk that the Court found unacceptably great when the confession is offered in the case in chief to prove guilt. The Court therefore concluded that something more than the totality test was necessary." *Id.* at 442.

Since *Miranda*, the Supreme Court has reiterated that an individual subject to in-custody interrogation must be advised that he has a right to have counsel present before and during interrogation. *Duckworth v. Egan*, 492 U.S. 195, 204 (1989) (*Miranda* requires "that the suspect be informed . . . that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one"); *California v. Prysock*, 453 U.S. 355, 361 (1981) (per curiam) (emphasizing the importance of telling an accused "of his right to

have a lawyer present prior to and during interrogation, and his right to have a lawyer appointed at no cost if he could not afford one").

There is "no talismanic incantation" that must be recited to satisfy *Miranda*. *Duckworth*, 492 U.S. at 202-03 (quoting *Prysock*, 453 U.S. at 359). "The inquiry is simply whether the warnings reasonably 'convey] to [a suspect] his rights as required by *Miranda*.'" *Id.* at 203 (quoting *Prysock*, 453 U.S. at 361). In *Duckworth*, the defendant was apprised of his rights as required by *Miranda*, with the exception that the officers stated an attorney "would be appointed if and when you go to court." *Id.* at 197-98. The Court emphasized, however, that the defendant was informed of his right to counsel 'before [the police] ask[ed] [him] questions,'" and of "his right to 'stop answering at any time until [he] talk[ed] to a lawyer.'" *Id.* at 205. Consequently, it held that the warnings satisfied *Miranda*. *Id.* The Court distinguished *Prysock* on the basis that the warnings in that case "linked" the defendant's "right to appointed counsel . . . with some future point in time after the police interrogation." *Id.* at 204-05 (quoting *Prysock*, 453 U.S. at 360).

The transcript of petitioner's interrogation reveals that, in an effort to comply with *Miranda*, detectives gave petitioner the following warning prior to their first interview of him at 7:35 a.m. on August 16, 1998: "Your rights are you have the right to remain silent. Whatever we talk about, and you say, can be used in a court of law, against you. And if you don't have money to hire an attorney, one's appointed to represent you free of charge. So those are your rights." *Lujan*, 92 Cal.App.4th at 1397. Defendant indicated he understood the rights. He was then interviewed briefly, and denied involvement in the crime. The first interview terminated at 9:05 a.m. A second audiotaped interview commenced some time later, and ended at 10:36 a.m.

At 5:40 p.m. that evening, the detectives began a third interview. Just after the interview commenced, the following colloquy took place between petitioner and Detective Reinaldo Rodriguez:

"[Petitioner:] Can I have an attorney present?

[Detective Rodriguez:] You want, you want an attorney present? You feel you need one?

18

1   [Petitioner:]  Yes I do.

2   [Detective Rodriguez:]  Okay.  All right.  If that's what you want to do, we'll do

3   that.

4   [Petitioner:]  Can I get one in here today?

5   [Detective Rodriguez:]  I really doubt it.  I mean I'm going to be honest with you.

6   It's Sunday evening.  When you go to court in a couple of days there will be one

7   appointed for you.  That's the way the system is set up.  If you have funds and you

8   want to call and hire your own attorney.  If you want to call and hire an attorney,

9   that's fine.  We've tried to deal with you fair.  I realize I was bad, I mean, not bad,

10  I was pissed off and I got upset.  A lot of that had to do because it was a deputy

11  involved, a deputy involved situation.  I shouldn't have been there, doing that, but

12  I was.  I've handled other deputy situations, it's just that this one, it just kind of,

13  I knew the guy.  So like I said it's up to you.  If you want to make a statement

14  without an attorney, that's up to you.  I doubt that if you hire an attorney they'll let

15  you make a statement, usually they don't.  That's the way it goes.  So, that's your

16  prerogative, that's your choice.  If you do want to talk to me without an attorney,

17  that's your choice.   You can just tell the jailer, 'hey, I'd like to talk to the

18  detectives without an attorney present.'  Okay.  That's your choice.

19  [Petitioner:]  Can I make a phone call real quick?

20  [Detective Rodriguez:]  Sure . . . .

21                                         * * *

22  [Detective Rodriguez:]  If you decide, after you make those calls, that you want to

23  talk to us —

24  [Petitioner:]  Yeah, I do want to talk to you.

25  [Detective Rodriguez:]  Okay.  Then we'll do that.  We'll be more than happy to

26  oblige you.  If you way you want to talk to us, that's without an attorney.

27  [Petitioner:]  Ummm.

28  [Detective Rodriguez:]  Or do you want to wait until after you make your calls?

[Petitioner:]  I want to wait until after I make my calls."

Petitioner was then escorted to a telephone.  Petitioner was unable to reach anyone, however, and asked to be brought back to the detectives rather than returning to his cell.  Upon reentering the interview room, petitioner and Detective Rodriguez had the following exchange.

[Petitioner:]  I didn't get ahold of anybody.

[Detective Rodriguez:]  No?  Did you want, uh, you look like you've been crying. You want to tell me about everything?  Okay.  All right.  Now, you've asked for an attorney, so if you want to talk about this, you'll have to tell me without an attorney present.  Is that your desire then?   Speak up if you can, you have to speak up.

[Petitioner:]  Can I have some tissue?

[Detective Rodriguez:]  Sure.  Sure.  It's tough, Kenny.

[Pause]

[Detective Rodriguez:]  I know, I know there's two sides to the story, my man, there's two sides to the story.  [pause]  You understand, you know, you said that you, you wanted to tell me what happened.  We've treated you fair, nobody's threatened you or anything of that nature . . . have we?

[Petitioner:]  No.

[Detective Rodriguez:]  Okay.  And you want to make a voluntary statement now without an attorney and tell me everything?

[Petitioner:]  Yes."

At the outset, the initial advisal of petitioner's rights is entirely distinguishable from the warnings given either in *Duckworth* and *Prysock*.[13]  In both of those cases, the defendant was

_____

[13]In *Duckworth*, the defendant was read the following:
"Before we ask you any questions, you must understand your rights.  You have the right to remain silent.  Anything you say can be used against you in court. *You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning*.  You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you*

20

specifically advised of his right to have counsel present during questioning. Here, no such admonition was given either directly or inferentially.[14]

---

*a lawyer, but one will be appointed for you, if you wish, if and when you go to court*. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer." *Duckworth*, 492 U.S. at 197-98 (emphasis original).

Twenty-nine hours later, the defendant was advised:

"Before this questioning, one of the officers read the following waiver form to respondent: [¶] '1. Before making this statement, I was advised that I have the right to remain silent and that anything I might say may or will be used against me in a court of law. [¶] '2. That I have the right to consult with an attorney of my own choice before saying anything, and that an attorney may be present while I am making any statement or throughout the course of any conversation with any police officer if I so choose. [¶] '3. That I can stop and request an attorney at any time during the course of the taking of any statement or during the course of any such conversation. [¶] '4. That in the course of any conversation I can refuse to answer any further questions and remain silent, thereby terminating the conversation. [¶] '5. That if I do not hire an attorney, one will be provided for me.'" *Id.* at 198-99.

In *Prysock*, the defendant was read the following:

"Sgt. Byrd: . . . Mr. Randall James Prysock, earlier today I advised you of your legal rights and at that time you advised me you did not wish to talk to me, is that correct? [¶] 'Randall P.: Yeah. [¶] 'Sgt. Byrd: And, uh, during, at the first interview your folks were not present, they are now present. I want to go through your legal rights again with you and after each legal right I would like for you to answer whether you understand it or not. . . . Your legal rights, Mr. Prysock, is [sic] follows: Number One, you have the right to remain silent. This means you don't have to talk to me at all unless you so desire. Do you understand this? [¶] 'Randall P.: Yeh. [¶] 'Sgt. Byrd: If you give up your right to remain silent, anything you say can and will be used as evidence against you in a court of law. Do you understand this? [¶] 'Randall P.: Yes. [¶] 'Sgt. Byrd: You have the right to talk to a lawyer before you are questioned, have him present with you while you are being questioned, and all during the questioning. Do you understand this? [¶] 'Randall P.: Yes.'" *Prysock*, 453 U.S. at 356-57.

[14]Nor, as respondent urges, is the present case affected by the Supreme Court's recent decision in *Florida v. Powell*, __ U.S. __, 130 S.Ct. 1195, 2010 WL 605603 (Feb. 23, 2010). In *Powell*, the following advisement was given:

"You have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a

The detective's offhand discussion of the unavailability of appointed counsel did not comply with *Miranda*'s requirement that a warning reasonably convey the accused's right to have counsel present before and during in-custody questioning.  At no time did Detective Rodriguez describe a "right" to have counsel present before and during questioning.  Indeed, his statement that "you'll have to tell me without an attorney present" admits of multiple interpretations, as does his statement that "[w]hen you go to court in a couple of days there will be one appointed for you. That's the way the system is set up."  It is ambiguity such as this that informs *Miranda*'s mandate that "[n]o amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in . . . stead [of warnings].  Only through such a warning is there ascertainable assurance that the accused was aware of this right."  *Miranda*, 384 U.S. at 471-72.

Respondent invites the court to look to petitioner's question as to whether he could have an attorney present and the "context" of the conversation, and to determine that petitioner understood his rights.  The court declines this invitation.  This is not a situation, as in *Duckworth*, where a defendant was advised of his rights, but in context the recital evidenced some ambiguity. Respondent cannot identify any statement Detective Rodriguez made that advised petitioner he had a right to counsel before and during questioning.  Consequently, applying a *de novo* standard of review, the court finds that the California Court of Appeal was correct when it held:

> "[I]n *Duckworth*, the defendant was twice advised of the right to counsel before and during questioning.  Such never occurred in the present case.  In the present case, the only advice concerning the presence of appointed counsel related to defendant was that an assigned attorney was unavailable on Sunday evening when the final

---

lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview." *Id*. at *3.

The Supreme Court emphasized that in combination, "the right to talk to a lawyer before answering any of [law enforcement's] questions" and "the right to use any of [his] rights at any time [he] want[ed] during th[e] interview" reasonably conveyed to defendant's his "right to have an attorney present, not only at the outset of interrogation, but at all times." *Id*. at *8.  The present case does not involve an imperfect advisement.  Neither a direct nor an inferential advisement like that in *Powell* was given in this case.

interview occurred. Defendant was never advised he had the right to appointed counsel before any questioning could occur and that [his] attorney could be present during the interview. The same is true in terms of retained counsel. Hence, all of defendant's inculpatory statements were inadmissible during the prosecution's case-in-chief." *Lujan*, 92 Cal.App.4th at 1402-03.

## C.    Harmless Error

### 1.    First Degree Murder and Special Circumstances

Even if a federal court determines that a state court's decision was contrary to, or an unreasonable application of, clearly established federal law, habeas relief may still be denied of the petitioner cannot show prejudice. A small group of "structural errors" are deemed so harmful that they warrant *per se* relief without regard to prejudice. *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). The overwhelming majority of trial errors, however, are nonstructural that are subject to harmless error analysis. *Id*. "When the [state] has the burden of addressing prejudice, as in excusing preserved error as harmless on direct review of the criminal conviction, it is not enough to negate an effect on the outcome of the case." *United States v. Dominguez Benitez,* 542 U.S. 74, 82 n. 7 (2004). Rather, under the standard set forth in *Chapman v. California*, 386 U.S. 18 (1967), "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id*. at 24.

When the state has the burden of showing that constitutional trial error is harmless on collateral review, however, "the heightened interest in finality generally calls for the [state] to meet the more lenient [*Brecht*] standard." *Dominguez Benitez*, 542 U.S. at 82 n. 7 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). Under *Brecht*, the critical question is "whether, in light of the record as a whole," the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 638 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Respondent objects to Judge Federman's recommendation that a writ issue because, assuming petitioner's confession was erroneously admitted and assuming that he would not have testified but for the error, she contends the jury would still have returned a multiple murder

special circumstance finding under California Penal Code § 190.2(a)(3).  The multiple murder offense applies where the defendant has, in the same proceeding, "been convicted of more than one offense of murder in the first or second degree."  CAL. PENAL CODE § 190.2(a)(3).  A necessary predicate to a multiple murder finding, however, is that the defendant have been "found guilty of murder in the first degree" with respect to at least one of the murders.  *Id.*, § 190.2.  California Penal Code § 189 defines first degree murder as including "[a]ll murder which is perpetrated . . . by any [ ] kind of willful, deliberate, and premeditated killing."  See *Patterson v. Gomez*, 223 F.3d 959, 964 (9th Cir. 2000) ("First degree murder is defined under California law as 'murder' that is a 'willful, deliberate, and premeditated killing,'" quoting CAL. PENAL CODE § 189).  Consequently, to prove a multiple murder special circumstance, the state must show that the defendant committed at least two murders, each of second degree or higher, and at least one of first degree.

Respondent contends that removing petitioner's confession and testimony from consideration does not disturb the regularity of the jury's verdict that petitioner's murder of his wife was premeditated.  In *People v. Anderson*, 70 Cal.2d 15 (1968), the California Supreme Court described the standard for evaluating premeditation.  The Court observed that "the legislative classification of murder into two degrees would be meaningless if 'deliberation' and 'premeditation' were construed as requiring no more reflection than may be involved in the mere formation of a specific intent to kill."  *Id.* at 26 (quoting *People v. Wolff*, 61 Cal.2d 795, 821 (1964)).  Thus, the Court "held that in order for a killing with malice aforethought to be first rather than second degree murder, '[t]he intent to kill must be . . . formed upon a *pre-existing reflection*' . . . [and have] been the subject of actual deliberation or *forethought*. . . .'"  *Id.* (quoting *People v. Thomas*, 25 Cal.2d 880, 900-01 (1945) (omissions and emphasis original)).  Moreover, the Court continued, "'a verdict of murder in the first degree . . . (on a theory of a wilful, deliberate, and premeditated killing) is proper only if the slayer killed 'as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on coolly and steadily, (especially) according to a Preconceived design.'"  *Id.* (quoting *People v. Bender*, 27 Cal.2d 164, 183 (1945) (emphasis original)).  See also *People v. Koontz*, 27 Cal.4th

1041, 1080 (2002) ("A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. . . . 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance").   Thus, in *Anderson*, the Court noted:

> "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing – what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed[,]' [ ]*Thomas*, [ ]25 Cal.2d [at] 898, 900, 901[ ]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).
>
> Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)."   *Anderson*, 70 Cal.2d at 26-27 (emphasis original).

As the California Supreme Court recently noted, the factors outlined in *Anderson* are still relevant, although "'[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations.  It did not refashion the elements of first degree murder or alter the

substantive law of murder in any way.'" *People v. Hovarter*, 44 Cal.4th 983, 1017 (2008) (quoting *People v. Thomas*, 2 Cal.4th 489, 517 (1992)).  See also *Koontz*, 27 Cal.4th at 1081 ("The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive").  Despite this fact, "[w]hen evidence of all three categories is not present, '[the California Supreme Court] require[s] either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.'"  *People v. Cole*, 33 Cal.4th 1158, 1224 (2004) (quoting *People v. Pensinger*, 52 Cal.3d 1210, 1237 (1991)).  See also *People v. Tafoya*, 42 Cal.4th 147, 172 (2007) ("[G]enerally first degree murder convictions are affirmed when (1) there is evidence of planning, motive, and a method of killing that tends to establish a preconceived design; (2) extremely strong evidence of planning; or (3) evidence of motive in conjunction with either planning or a method of killing that indicates a preconceived design to kill," quoting *People v. Mincey*, 2 Cal.4th 408, 434-35 (1992)).

In *Hovarter*, the Court considered a murder by strangulation, and noted that a "prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act.  'A rational finder of fact could infer that [this manner of killing] demonstrated a deliberate plan to kill her.'"  *Hovarter*, 44 Cal.4th at 1020 (quoting *People v. Davis*, 10 Cal.4th 463, 510 (1995) (holding that because strangulation took up to five minutes, a rational trier of fact could infer that the manner of killing demonstrated a deliberate plan)).  Nonetheless, "'[t]he true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"  *People v. Young*, 34 Cal.4th 1149, 1182 (2005) (quoting *Koontz*, 27 Cal.4th at 1080).  "Thus, '[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'"  *People v. Halvorsen*, 42 Cal.4th 379, 437 (2007) (quoting *People v. Stitely*, 35 Cal.4th 514, 543 (2005)).  See also *People v. Cole*, 33 Cal.4th 1158, 1207-08 (2004) ("The word 'premeditated' means considered beforehand").

Respondent asserts that the following facts established at trial support a finding of harmless

error: (1) petitioner stalked his wife prior to her death and made threats to kill her;[15] (2) petitioner committed the act within days of being served with divorce papers; (3) petitioner committed the act upon seeing Monica Lujan in the company of another man; (4) petitioner had a habit of unexpectedly checking up on Monica Lujan either late at night or early in the morning; (5) petitioner had asked the couple's son about men with whom he had seen Monica Lujan and whether Monica Lujan had been dating; (6) the murder of Monica Lujan required more than one blow to the head; and (7) petitioner's admitted to his brother an hour later that he had been in a fight with Monica Lujan and had hurt her.

Much of this evidence goes to the issue of whether petitioner was the person who bludgeoned the two victims with the concrete block, causing their death. Petitioner's admission provides no evidence as to whether he acted with premeditation or deliberation. In conducting a harmless error analysis, the court's focus must be on the jury's findings of premeditation and deliberation, since those findings were necessary to a finding of first degree murder, and hence to application of the multiple murder enhancement. In the court's view, the evidence that petitioner regularly appeared at Monica Lujan's house late at night or early in the morning weighs against a finding of premeditation. It is possible, of course, that petitioner decided to go to Monica Lujan's house that night with the premeditated intent to murder her; it is more likely, however, that a jury would have found that the visit was one in a series of instances in which petitioner went to Monica Lujan's house with the intent to stalk and harass her. Upon arriving, petitioner may have formed a rash impulse to kill. Cf. *Halvorsen*, 42 Cal.4th at 438-39 (holding that eyewitness testimony that defendant shouted to the victim before shooting him may have

---

[15]Specifically, approximately one month before the murder, after Monica Lujan threatened to get a restraining order, petitioner stated, "Go ahead. That is, if you're still alive." Early one morning the next week, petitioner followed Monica Lujan to the sheriff's station as she fled his stalking attempt, stating "You're never going to get rid of me, Monica." At that time, petitioner also simulated a gun with his fingers, placing his hand to the temple of his head, and pulled the trigger saying, "This is going to be you." Years earlier, when Monica Lujan discovered that petitioner was having an extramarital affair, she confronted him, whereupon he attacked her and began to choke her. After being pulled away by petitioner's brother, petitioner stated "I'll kill you if you ever try to leave me." (Objections at 14.)

suggested some intent to draw the victim toward him so that he could be shot, but could also have reflected that defendant intended to ask the victim a question, and "suddenly formed a rash impulse to kill him based on [the victim's] response or . . . something in his manner").

Moreover, the court notes that the fact that petitioner used a concrete block at the scene weighs against a finding of premeditation. This stands in contradiction to cases in which a defendant brought a weapon and such fact supported premeditation and deliberation. See, e.g., *Tafoya*, 42 Cal.4th at 172 (evidence that defendant was carrying a loaded gun supported finding of premeditation); *Koontz*, 27 Cal.4th at 1081 (finding that where defendant armed himself with two concealed and loaded handguns before the crime, such evidence supported finding of planning activity under *Anderson*).

Respondent's argument that petitioner may have premeditated and deliberated in the moments between the first and second blows warrants consideration. In *San Nicolas*, the defendant stated that he saw his victim's reflection in a bathroom mirror before turning around and stabbing her. *San Nicolas*, 34 Cal.4th at 658. The California Supreme Court ruled that the brief period between seeing the victim's reflection and stabbing her was adequate for the defendant to have reached the deliberated and premeditated decision to kill her. *Id.* In *San Nicolas*, however, the trial court had the benefit of defendant's testimony that he saw the victim in the mirror, and regarding the motive and manner of the gilling. It concluded defendant believed that the victim had seen him murder another person, and "that it was necessary to kill the young girl to prevent her from informing the police and ultimately testifying as a witness against him." *Id.*

Here, in the absence of petitioner's confession and testimony, respondent's argument that petitioner had an "ample opportunity" to reflect, and that he did in fact so reflect, is speculative. Rather, had the confession and testimony not been in evidence, there would have been little, if any, evidence regarding defendant's actions or thoughts in the period immediately preceding the murder. The state would have been left to argue that petitioner's prior threats and stalking of the victim, and the manner of killing, demonstrated premeditation and deliberation. In *Anderson*, however, the Court noted that "the brutality of a killing cannot in itself support a finding that the

28

killer acted with premeditation and deliberation.  'If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations.'" *Anderson*, 70 Cal.2d at 24-25 (quoting *People v. Caldwell*, 43 Cal.2d 864, 869 (1955)).

The cases respondent cites as evidence that prior threats establish premeditation, moreover, do not support her position.  The California Supreme Court's decision in *People v. Rodriguez*, 42 Cal.3d 730 (1986), establishes only that threats are relevant and admissible to prove intent in a prosecution for murder; it does not address premeditation.  *Id.* at 756-57 ("A defendant's threat against the victim, however, is relevant to prove intent in a prosecution for murder").  It is true that in a later section of the opinion, the Court noted that defendant's "prior threats and crimes furnished proof of planning and motive that did not duplicate the evidence of what happened at the scene."  This observation, however, concerned the admissibility of evidence; it did not address the weight or effect of the evidence.  *Id.* at 758.  Similarly, in *People v. Goldbach*, 27 Cal.App.3d 564 (1972), the court addressed the admissibility, but not the weight, of evidence of prior threats.  *Id.* at 569-70 (holding that nothing in the Evidence Code prohibited the admission of evidence of threats).  Similarly, in *People v. Karis*, 46 Cal.3d 612, 636-38 (1988), the court held only that evidence of prior threats was admissible.

While respondent has shown that prior threats are admissible circumstantial evidence of motive and planning, it is unclear whether petitioner's threats – two of which were implied only and occurred three weeks to a month before the murder, and one of which was explicit but occurred years earlier – would have been sufficient to demonstrate premeditation and deliberation.  To answer this question, a jury would have to consider petitioner's unstable behavior, the lack of specificity in the threats, and the interval between the threats and the killing.  Ultimately, it would have had to conclude whether petitioner was unstable and making rash threats, or whether the threats were indicative of a motive and plan to kill his wife.

The Ninth Circuit, quoting *Kotteakos*, recently reiterated the standard on harmless-error review:

"If, when all is said and done, the [court's] conviction is sure that the error did not

influence the jury, or had but very slight effect, the verdict and the judgment should stand. . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Fields v. Brown*, 503 F.3d 755, 800 (9th Cir. 2007) (en banc) (quoting *Kotteakos*, 328 U.S. at 764-65).

On the present facts, after stripping defendant's confession and testimony from the record, the court cannot say, with fair assurance, that the killing of Monica Lujan "occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse," *Halvorsen*, 42 Cal.4th at 437, and that the jury would, on the basis of the remaining evidence, found petitioner guilty of first degree murder. Cf. *People v. Jurado*, 38 Cal.4th 72, 127 (2006) ("CALJIC No. 8.20, defining premeditation and deliberation, does not suggest that a defendant must absolutely preclude the possibility of premeditation rather than merely raising a reasonable doubt").

In this regard, the Ninth Circuit recently cautioned district courts to be "mindful of the Supreme Court's admonition as to the devastating power of confessions":

"'A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Bruton v. United States*, 391 U.S. [123,] 139-40 [(1968)] (White, J., dissenting). See also *Cruz v. New York*, 481 U.S. [186,] 195 [1987] (White, J., dissenting) (citing Bruton ). . . . [A] full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in

30

1     reaching its decision.'" *Taylor v. Maddox*, 366 F.3d 992, 1017 (9th Cir. 2004)

2     (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)).

3          In sum, because the court has doubts as to whether the jury would have found petitioner

4     guilty of the first degree murder of Monica Lujan absent evidence of his confession and his

5     testimony, both the first degree murder convictions and the special circumstance of multiple

6     murder fall.   Consequently, following *de novo* review of Judge Federman's Report and

7     Recommendation, the court affirms her finding that the first degree murder convictions and

8     findings of the special circumstances of lying in wait and multiple murders did not result from

9     harmless error.[16]

10                    **2.    Second Degree Murder and Heat of Passion**

11          A federal court may find constitutional error and issue a conditional writ that requires the

12    state to release a petitioner unless it takes some remedial action, including initiation of proceedings

13    either to modify the conviction to one for a lesser included offense or to retry petitioner.  *Harvest*

14    *v. Castro*, 531 F.3d 737, 740 (9th Cir. 2008) (affirming issuance of a conditional writ directing

15    that the state release petitioner unless "the state initiates proceedings to either modify the

16    conviction to one for second degree murder or to retry Petitioner").  Consequently, the court finds

17    it appropriate to conduct a separate harmless error analysis with respect to the lesser included

18    offense of second degree murder.

19          Respondent asserts that a second degree murder conviction is sustainable in light of

20    ongoing stalking and threatening behavior of petitioner, Monica Lujan's recent service of divorce

21    papers on petitioner, petitioner's habit of unexpectedly checking up on her late at night,

22    petitioner's habit of displaying anger toward any male in her company, petitioner's repeated

23    inquiries to his son regarding the men with whom Monica Lujan was spending time, including

24    specific inquiries regarding the second victim, and the fact that petitioner admitted to his brother

25    within an hour of the murders that he had gotten into a fight with Monica Lujan and might have

26    _____

27         [16]Respondent did not object to Judge Federman's finding that the jury's finding of the
      special circumstance of lying in wait was not the product of harmless error.   This is
28    understandable, as the only evidence that supported the finding was petitioner's testimony.

hurt her.   These facts, although insufficient to establish premeditation and deliberation, are sufficient to establish that petitioner was the one who struck Monica Lujan and her male companion repeatedly with a fifteen pound concrete block.

"When an unlawful assault is made with a deadly weapon upon the person of another, resulting in death, and the assault is not provoked or perpetrated in necessary self-defense, or in the heat of passion, malice may be presumed.   Under such circumstances, the killing may constitute murder of the second degree when it is not perpetrated by means of poison, lying in wait, torture or any other kind of wilful, deliberate or premeditated killing." *People v. Summers*, 147 Cal.App.3d 180, 187 (1983) (quoting *People v. Butterfield*, 40 Cal.App.2d 725, 729 (1940)). Viewing the record as a whole, the court cannot find that the admission of petitioner's confession and testimony had a "substantial and injurious effect" on a finding of second degree murder. *Brecht*, 507 U.S. at 627.

Petitioner argues that based on petitioner's confession and testimony, specifically his admission of lying-in-wait behavior, the trial court declined to instruct on a heat-of-passion defense.   Respondent objects to petitioner's attempt to raise this issue, since the premise of his petition is that he would not have testified to his activity on that night had the confession not been admitted, and his testimony was the only evidence of lying-in-wait.

""The heat of passion requirement for manslaughter has both an objective and a subjective component. . . .   The defendant must, subjectively and actually, kill under the heat of passion. . . .   But the circumstances giving rise to the heat of passion are viewed objectively.   As we explained long ago in interpreting the language of section 192, 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.'" *People v. Cole*, 33 Cal.4th 1158, 1215-16 (2004) (quoting *People v. Steele*, 27 Cal.4th 1230, 1252-53 (2002)).

Absent evidence regarding what petitioner saw before he killed the two victims, he cannot carry his burden on either the subjective or objective prong.  The evidence introduced at trial showed that over an extended period of time, petitioner had become increasingly disturbed about his relationship with Monica Lujan.  He had stalked, harassed, and threatened her.  Petitioner's jealousy of all men, and of Madrigal in particular, had grown over time.  A California appellate court, reviewing existing case law, recently rejected such a heat-of-passion defense:

> "There was no evidence of a sudden quarrel, but only proof of a violent attack . . . .  There was no sudden heat of passion, but only evidence of a persistent, brooding jealousy which spurred [the killing]. . . .  Upon these facts the killing was not manslaughter; it was, at the least, murder of the second degree."  *People v. Hach*, 176 Cal.App.4th 1450, 1459 (2009) (quoting *People v. Hudgins*, 252 Cal.App.2d 174, 181 (1967)).

Without petitioner's testimony and confession, there is no evidence that he saw Madrigal and Monica Lujan intimately touching one another, nor evidence that petitioner believed, reasonably or not, that Madrigal and Monica Lujan had recently had sexual intercourse.  In the section of petitioner's traverse arguing that there was evidence to support the giving of a manslaughter instruction, he discusses evidence of the extended decline in the Lujans' marriage, petitioner's testimony regarding what he did and saw on the night of the murders, and the testimony of petitioner's expert that petitioner was suffering from clinical depression and such clinical depression might be connected to premeditation and deliberation.[17]  As noted, exclusion of petitioner's testimony eliminates crucial evidence regarding what he saw and how he felt.  Evidence of a long-simmering jealousy and estrangement cannot support a finding that the killings were the product of sudden heat-of-passion.  Similarly, the psychological testimony regarding petitioner's depression related such evidence only to the issue of premeditation, not to heat-of-passion.  Moreover, standing alone, the psychological testimony would not be sufficient to not support an affirmative finding on the objective prong of a heat-of-passion defense because, absent

_____

[17]Traverse at 52-53.

petitioner's testimony, the jury would be unable to determine whether the facts and circumstances that confronted petitioner were objectively sufficient to trigger a heat-of-passion response. Consequently, the court concludes that the error of admitting petitioner's confession and testimony was harmless as respects the lesser included offense of second degree murder.

## CONCLUSION

For the reasons stated, the court amends Judge Federman's order. Consistent with these findings, respondent must release petitioner within ninety days of the date of this order unless within that period of time the state initiates proceedings to either modify the convictions to convictions for second degree murder or to retry petitioner.

IT IS ORDERED that judgment be entered consistent with this order, granting a conditional Petition  for Writ of Habeas Corpus.

IT IS FURTHER ORDERED that the clerk serve copies of this Order, the Magistrate Judge's Report and Recommendation, and the Judgment on petitioner by United States mail.

DATED: March 30, 2010

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE